# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **LAVERN L. HAMPTON** | **CIVIL ACTION NO. 3:14-cv-2612** |
| **LA. DOC #572566** | |
| | **SECTION P** |
| **VS.** | |
| | **JUDGE ROBERT G. JAMES** |
| **WARDEN BURL CAIN** | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Lavern L. Hampton, an inmate in the custody of Louisiana's Department of Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on August 28, 2014.  [doc. # 1].  Petitioner attacks his second degree murder conviction and the life sentence imposed by the Fourth Judicial District Court, Ouachita Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.

## Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit Court of Appeal as follows:

> The defendant had been in a relationship with Vonkeisha Drake for four years. He lived with Ms. Drake and her two children at the home of Ms. Drake's cousin, Angela Chapman. Ms. Chapman and her three children also lived in the house. The relationship between the defendant and Ms. Drake deteriorated and the defendant was asked to move out.

> On August 14, 2008, shortly after the breakup, the defendant went to Ms. Chapman's house to talk to Ms. Drake. Otis King, a family friend of Ms. Chapman, was at the house along with Bruce Johnson. According to Ms. Chapman, the defendant came from behind the house and charged at Ms. Drake. Mr. King stepped in front of the defendant to protect Ms. Drake. The defendant swung at Mr. King.

> Mr. King and the defendant got into a tussle. Mr. King was larger than the defendant and was able to subdue him. Mr. King held the defendant down until he begged to

be released. Mr. King allowed the defendant to get up. As he was walking away, the defendant said to Mr. King, "I got you."

At some point that day after leaving Ms. Chapman's house, the defendant passed by a residence where Joshua James and several other men were sitting outside. The men observed that the defendant had been in a fight. The defendant related the tale of his altercation with Mr. King. According to the defendant, the men offered to return to Ms. Chapman's house with him. The defendant decided to return to the Chapman residence to settle the score with Mr. King. The defendant armed himself with a big stick or log and Mr. James accompanied him to the Chapman house where they waited for Mr. King.

Mr. King had driven Ms. Chapman, one of her children, and Ms. Drake to a convenience store. The group arrived at Ms. Chapman's house late in the evening, between 9:00 and 11:00 p.m.  Ms. Drake and the child headed into the house followed by Ms. Chapman and Mr. King. The defendant and Mr. James came from behind the house on opposite sides and grabbed Mr. King, preventing him from entering the house. The women ran inside. The defendant knocked on the window with the large stick and told Ms. Drake, "I'm going to get you next."

The defendant hit Mr. King in the head several times with the stick, causing a large gash on the back of the victim's head. Mr. James had a gun and hit Mr. King in the head with it several times. At some point, either the defendant or Mr. James had a knife and stabbed Mr. King multiple times. One wound punctured Mr. King's heart and two other wounds entered his lung. The victim's wallet was taken and the two left the scene. Mr. King bled to death from his wounds. Police were summoned and the defendant was identified as one of the perpetrators.

Detective Quinton Holmes of the Monroe Police Department called the defendant's cell phone number around 3:00 or 4:00 a.m. the next morning, but did not get an answer. Detective Holmes called the number again around 6:15 a.m. and the defendant answered. The defendant said he knew that Detective Holmes was a cop and stated, "I didn't kill anyone." Detective Holmes asked if he could come and pick the defendant up to talk to him. The defendant stated he would meet Detective Holmes at a local restaurant, but did not appear.

Another member of the Monroe Police Department knew where the defendant lived and officers went to that area, which was consistent with a GPS location of the defendant's cell phone supplied by the defendant's cell phone provider. Officers saw the defendant, who began running through a yard and an alley. After a two-block foot pursuit, the defendant was apprehended. The defendant asked to get his cell phone which was in the house being charged. The police retrieved the cell phone.

The defendant was arrested and advised of his *Miranda* rights; he then gave a

statement to the police. The defendant detailed his original fight with Mr. King and admitted going to Ms. Chapman's house a second time with another man, whose name he did not know, in order to settle the score with Mr. King. The defendant stated that he hit Mr. King in the head twice with a large stick, but claimed that the other man fought with the victim and took his wallet. Various scratches and cuts were observed on the defendant's hands and torso. He claimed that he received the injuries when he fought with Mr. King the first time. He later said he was injured when he was arrested by the police.

After his interview, the defendant was transported by Detective Holmes. Detective Holmes asked the defendant who aided him in committing this crime. The defendant stated that he could assist in locating the man who helped him attack Mr. King. The defendant directed Detective Holmes to a house which the detective knew was inhabited by people who would not be cooperative with law enforcement officials. After calling for assistance from other officers, the male residents were cleared out of the house and positioned where the defendant could see them from his seat in the police car. Among the individuals was Joshua James, whom the defendant identified as the person who participated in the beating and murder of Mr. King. A search of the house yielded the victim's wallet. Three shirts were found in a trash can behind the house. In the backyard, police recovered another shirt and a bicycle. In a search of Mr. James incident to his arrest, police recovered several credit cards and other cards belonging to Mr. King. Mr. James eventually directed officers to where they could recover the handgun used to beat Mr. King.

The defendant was charged by grand jury indictment with second degree murder. He was tried by jury and convicted of the second degree murder of Mr. King. The defendant filed a motion for post verdict judgment of acquittal and alternatively, a motion for new trial, claiming that the evidence was insufficient to support his conviction. The motions were denied by the trial court. The defendant was sentenced to serve the mandatory sentence of life in prison without benefit of parole, probation, or suspension of sentence.

*State v. Hampton*, 69 So. 3d 614, 615-17 (La. App. 2 Cir. 2011).  The appellate court affirmed

Petitioner's conviction and sentence on May 18, 2011.  *Id.*  The Louisiana Supreme Court denied

Petitioner's subsequent application for writ of *certiorari* on February 3, 2012.  [doc. # 1-2, p.

67].

Petitioner filed a *pro se* application for post-conviction relief in the trial court on January

18, 2013.  [doc. # 9-13, p. 5-7].  The trial court denied the application on March 22, 2013.  [doc.

# 9-14, p. 22].  Petitioner then sought supervisory review of the trial court's order before the Second Circuit Court of Appeal.  *Id.* at 26.  The Second Circuit, on May 31, 2013, granted Petitioner's application, remanded the matter, and instructed the trial court to order Petitioner to submit a response and to expound upon its "alternative finding that [Petitioner's] claims [were] without merit."  [doc. # 9-15, p. 1].  On remand, the trial court denied relief and adopted the State's arguments as its reasons for judgment.  *Id.* at 12.  The Second Circuit Court of Appeal denied Petitioner's ensuing application for supervisory review on October 10, 2013.  *Id.* at 50. The Louisiana Supreme Court, on June 13, 2014, likewise denied Petitioner's application.  *Id.* at 80.

Petitioner filed the instant Petition on August 28, 2014.  [doc. # 1].  He raises the following claims: (1) the trial court erred on collateral review; (2) insufficient evidence; (3) two claims of erroneous jury instruction; (4) two Confrontation Clause violations; (5) prosecutorial misconduct; (6) trial court error in failing to "instruct and sequester the jury" appropriately; and (7) ineffective assistance of counsel.  *Id.*

The matter is now before the Court.

## Law and Analysis

### I.   Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state court:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II.   Petitioner's Claims

A. Claim One: State *Habeas* Court Error

Petitioner claims that the trial court, on collateral review, erred when it adopted the State's arguments as the basis for its holding. [doc. # 1-1, p. 14]. Infirmities in state *habeas corpus* proceedings do not state a claim for federal *habeas corpus* relief. *Vail v. Procunier*, 747

F.2d 277 (5th Cir. 1984); *see Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999).  Accordingly, this claim is not cognizable and should be **DENIED**.

B. Claim Two: Insufficient Evidence

Petitioner claims that the evidence presented at trial was insufficient to find him guilty of second degree murder.  [doc. # 1-1, p. 18].  He argues specifically that the evidence was insufficient to support a finding he intended to kill the victim, that he intended to inflict great bodily harm on the victim, or that he was a principal in the armed robbery.  *Id.* at 18-22.

When a *habeas* petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence."  *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Here, invoking *Jackson*, the Second Circuit Court of Appeal began by referencing the pertinent definitions of second degree murder found in LA. REV. STAT. § 14:30.1:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery, first degree robbery, second degree robbery, simple robbery, . . . even though he has no intent to kill or to inflict great bodily harm.

*Hampton*, 69 So. 3d at 617-18.  With respect to 14:30.1(A)(1), the court noted that the State "is not required to show that the defendant's conduct was the sole proximate cause of the victim's death," rather, the State need only show "that the defendant's actions were a 'contributing cause' or a 'substantial factor' in the resulting death of the victim."  *Id.* (citing *State v. Stone*, 758 So. 2d 997 (La. App. 2 Cir. 2000)).

As to 14:30.1(A)(2), the court observed that a person can be convicted of second degree felony murder if he is a principal to an armed robbery that resulted in the killing of a human being.[1]  *Id.* at 618.  The court added, "no intent to harm or kill is necessary to be a principal to second degree murder" that occurred in the course of a robbery, rather, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention."  *Id.* (citations omitted).  The court then summarized the relevant testimony presented at trial:

> Ms. Chapman testified that on August 14, 2008, the defendant came from behind the house and charged at Ms. Drake. Mr. King was present. He stepped in front of Ms. Drake and told the defendant, "You ain't fixing to fight her while I'm around here at Angie's house." The defendant started swinging and Mr. King was able to get the defendant down on the ground. The defendant begged to be let up and Mr. King complied. As the defendant was leaving, he said to Mr. King, "I got you."

---

[1] LA. REV. STAT. § 14:24 states, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

At approximately 11:00 p.m., Ms. Chapman returned from a convenience store with Mr. King and Ms. Drake. Ms. Chapman testified that when the group tried to enter the house, some boys pulled Mr. King out of the house, preventing him from entering. She stated that there were three attackers, one of which was the defendant. Ms. Chapman said she saw a gun lying on an old refrigerator outside the house. A struggle ensued between the men and Mr. King. According to Ms. Chapman, the defendant was holding a log; he tapped on a window of the house and told Ms. Drake, "I'm going to get you next." After the fighting stopped, Ms. Chapman looked out and saw that Mr. King was bleeding to death.

Ms. Drake testified that at the time of this incident, she was living with her cousin, Ms. Chapman. The defendant had been her boyfriend and **10 had lived with her at the house, but he had been asked to leave. Mr. King was a friend of Ms. Chapman's and was at the house when the defendant came by on the day of this incident. The defendant was wearing basketball shorts and no shirt. Ms. Chapman saw the defendant, and called out to Ms. Drake to watch out because the defendant was behind her. Ms. Drake stated that the defendant was coming toward her like he was going to jump on her. Mr. King told the defendant that none of that was going on at Angela's house. The defendant struck Mr. King and the two wrestled in a ditch. Mr. King held the defendant down until eventually the defendant asked to be let go. When Mr. King released him, the defendant indicated that he was going to get Mr. King.

Later that night, Mr. King took Ms. Chapman and Ms. Drake to a store. When they returned to the house, Ms. Chapman pushed Ms. Drake into the house. Ms. Drake testified that she saw the defendant outside the window holding a log or tree branch that was 14 to 16 inches long and as thick as the defendant's forearm. It took both hands for the defendant to hold it. When Ms. Drake asked the defendant what he was doing with the log, he told her to shut up and that she was next. Ms. Drake stated that she never saw the defendant with a gun or a knife.

Detective Holmes testified at trial and outlined the events leading up to the arrest of the defendant, which are set forth above. Detective Holmes stated that blood was found on the door frame of the house where the defendant's cell phone was located. Detective Holmes also detailed the fact that the defendant gave a statement and led investigators to arrest Mr. James.

Detective Mark Nappier of the Monroe Police Department was present when the defendant gave his statement. Detective Nappier stated the defendant identified Mr. James as the individual who helped him attack Mr. King. When Mr. James was arrested, he had in his possession the victim's credit cards and other cards. Detective Nappier also identified pictures of the defendant's injuries taken on the day he was arrested for this offense. Detective Nappier testified that he had 18 years' experience as a police officer and that it was not uncommon for someone using a knife to sustain

cuts. Among the defendant's injuries photographed at his arrest were small cuts on his hands consistent with the use of a knife.

Following his arrest, the defendant gave a statement to police. He stated that he went to Ms. Chapman's house to talk to his girlfriend, Ms. Drake. He claimed that Mr. King ran around a truck and rushed him and they had a fight. While Mr. King had the defendant on the ground, the defendant gave up. After leaving the Chapman residence, the defendant went to a house on Crescent Drive where he had left his bicycle. Several men were sitting outside and noticed that the defendant had been in a fight. They offered to go back to the Chapman house with the defendant. The defendant stated that he was wearing shorts and a black hat with the letter "L" on it. He was carrying his shirt in his hand. The defendant and one of the men went back to the Chapman residence. The defendant claimed that he did not know the man's name. The man was later identified as Mr. James. The defendant stated that Mr. James had a gun and the defendant was carrying a large stick. The defendant said that he went back to the house to get revenge on Mr. King. He stated that they walked through an alley and came around on opposite sides of the house. The defendant admitted hitting Mr. King in the head twice with the stick before Mr. James jumped into the altercation. According to the defendant, Mr. James hit Mr. King with the gun and took Mr. King's wallet.

Captain Richard B. Jones of the crime scene identification division of the Monroe Police Department testified regarding the collection of evidence. He made photographs at the Chapman residence where Mr. King was killed and collected fingerprints and blood from a car and a truck at the residence. He took swabs from a refrigerator and a fence post at the scene. DNA analysis showed that the blood came from Mr. King.

At the house where Mr. James was arrested, a trash can was searched and photographed which contained three shirts and the victim's wallet. A black shirt was found by the porch. A bicycle was found behind a storage building and a shirt was on the ground next to the bicycle. A white T-shirt tested positive for blood, but no DNA could be extracted from it. A tank top found behind the storage shed at Mr. James's house tested positive for blood. The DNA showed that the blood was consistent with the victim, Mr. King. The shirt also showed non-blood DNA from a major contributor who was determined to be Mr. James. DNA from another individual was also present, but could not be identified. A shirt found in the backyard of Mr. James's residence contained blood which was shown to have come from the victim. The gun recovered from Mr. James, which was used in the beating of Mr. King, had blood on it. The DNA analysis showed that the blood belonged to Mr. King.

At the house where the defendant was arrested, two streaks of blood were found on the front door, at hand height. DNA analysis showed that the blood belonged to the

defendant. The defendant's cell phone was found in the house. In the alley behind the house, police retrieved a black cap with the letter "L" on it. A pair of underwear taken from the defendant when he was arrested tested positive for the defendant's blood.

Dr. Frank Peretti testified as an expert in forensic pathology. He performed the autopsy on Mr. King and stated that the victim had multiple stab and cutting wounds and multiple blunt force head injuries. Dr. Peretti described one blunt force injury to the head which was likely caused by something like a two-by-four or a baseball bat. The wound would have caused profuse bleeding. Other injuries were consistent with pistol whipping.

Among the abrasions and bruises on the body, Dr. Peretti noted superficial cuts on the victim's arms classified as defense wounds inflicted by a knife. The victim had numerous stab wounds to his torso that did not penetrate deeply. Two stab wounds on the right side of the chest penetrated into the chest cavity. One wound entered the upper lobe of the right lung and the other wound entered the lower lobe. A stab wound on the left chest went into the pericardial sac and terminated in the right ventricle of the heart. Another stab wound entered the abdomen, but did not strike any major organs. According to Dr. Peretti, the stab wounds to the lung and heart were the cause of Mr. King's death. However, his other wounds, including the head wound, caused loss of blood which also contributed to the victim's death.

*Id.* at 618-621.

Applying *Jackson*, the court held that "the evidence was ample to find that the defendant committed the essential elements of second degree murder beyond a reasonable doubt." *Id.* at 621. The court reasoned:

The grand jury indictment against the defendant simply charges him with second degree murder, a violation of La. R.S. 14:30.1. It does not specify whether he violated La. R.S. 14:30.1(A)(1) or La. R.S. 14:30.1(A)(2). The evidence in this case clearly establishes all the elements of either charge beyond a reasonable doubt.

Under La. R.S. 14:30.1(A)(1), the state was required to show that the defendant had the specific intent to kill or inflict great bodily harm. The defendant erroneously argues that the state had to prove specific intent to kill. In this case, the defendant admitted arming himself with a log or large tree branch, enlisting the aid of Mr. James, going to the Chapman residence, lying in wait for Mr. King, and ambushing him. The defendant also admitted striking the victim in the head with the log or branch at least twice. The victim sustained a large gash on his head which bled profusely and contributed to his death. These facts show that the defendant

10

participated in a brutal attack upon Mr. King and the defendant had, at the very least, the requisite specific intent to inflict great bodily harm. This is sufficient evidence upon which to base the defendant's conviction for second degree murder.

Further, although it is unclear whether the defendant or Mr. James wielded the knife which inflicted the fatal wounds upon Mr. King, the defendant was at least a principal to second degree murder by virtue of the fact that he returned to the Chapman residence with Mr. James in order to attack Mr. King. If Mr. James inflicted the stab wounds, by enlisting and accepting the aid of Mr. James in ambushing Mr. King, the defendant directly or indirectly counseled or procured Mr. James to commit the crime. This is sufficient evidence upon which to base the defendant's conviction for the offense charged.

Finally, the defendant and Mr. James acted together in ambushing and attacking Mr. King. During the course of the fatal attack, the victim's wallet was stolen. This constitutes sufficient evidence for the trier of fact to conclude that the defendant was at least a principal to felony murder under La. R.S. 14:30.1(A)(2), which does not require the finding of specific intent to harm or kill.

*Id.*

Here, a review of the state court record shows that the appellate court's application of *Jackson* was not objectively unreasonable.  This claim should be **DENIED**.

C. Claim Three: Erroneous Jury Instructions

Petitioner claims that the trial court's jury instructions were erroneous for two reasons. First, he clams that the trial court erroneously instructed the jury members that they could return a manslaughter verdict only if they found that Petitioner killed the victim with the specific intent to kill, that Petitioner killed with the intent to inflict great bodily harm, or if Petitioner was engaged in the perpetration of an enumerated felony.  [doc. # 1-1, p. 22-23].  According to Petitioner, the instructions precluded a manslaughter verdict if the jury found that he was a principal and did not actually kill the victim.

Petitioner's next claim is twofold.  He first argues that the court's definition of principals—which he does not claim is inaccurate—implied that the jury could find him guilty

11

without regard for his personal mental state as long as it found that Joshua James had the requisite mental state.  *Id.* at 30-31.  Next, he maintains that the court's instructions placed the burden on him to prove that he did not have any intent to kill.  *Id.* at 32.

It is well-settled that improper jury instructions in state criminal trials generally do not provide a basis for federal *habeas* relief.  *Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991).  In order for a jury instruction by a state court to warrant relief, the petitioner must show not only that the instruction given was erroneous, but also that it resulted in prejudice of a magnitude so severe that his rights to due process were violated.  *Cupp v. Naughten*, 414 U.S. 141 (1973); *Sullivan v. Blackburn*, 804 F.2d 885 (5th Cir. 1986).

Here, the Court finds no error in the trial court's instructions.  [*See* doc. # 9-4, p. 3-11]. Contrary to Petitioner's first claim, the trial court set forth accurate definitions of second degree murder,[2] manslaughter,[3] and principals.[4]  *Id.* at 8.

Turning to the first portion of Petitioner's second claim, the court's instructions did not relieve the prosecution of its burden of proving that he personally possessed the requisite mental state because, as noted above, they clearly stated that Petitioner could "only be convicted as a principal for those crimes for which he personally [had] the requisite mental state."  *Id.* Petitioner's final point of error—that the trial court placed the burden of proof on him—is also without merit.  The trial court properly stated that "[t]he burden is entirely upon the State to prove the defendant's guilt beyond a reasonable doubt."  *Id.* at 9-4.

---

[2] La. Rev. Stat. § 14:30.1.

[3] *Id.* § 14:31.

[4] *Id.* § 14:24.

For these reasons, the undersigned finds no basis for holding that the instructions were constitutionally deficient.  Petitioner's claim should be **DENIED**.

D. Claim Four: Confrontation Clause Violations

Petitioner claims that the trial court violated his Confrontation Clause rights twice.  He first claims that the trial court refused to allow him to cross-examine Joshua James.  [doc. # 1-1, p. 27].  Second, he argues that the trial court allowed two witnesses to recount Joshua James's out-of-court statements.  *Id.* at 40.

The Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  "The provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had [] a prior opportunity for cross-examination.'"  *Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 51 (2004)).  Its application is quite plainly limited to "witnesses against the accused—in other words, those who bear testimony."  *Crawford*, 541 U.S. at 51 (internal quotation marks and citation omitted); *see also Davis*, 547 U.S. at 821 (noting that the critical portion of the *Crawford* holding was the phrase "testimonial statements," because only testimonial statements "cause the declarant to be a witness within the meaning of the Confrontation Clause.").  "Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Crawford*, 541 U.S. at 51.

Here, considering Petitioner's first claim, the defense called Dennis Parmer, an officer with the Ouachita Parish Sheriff's Department, as a witness.  [doc. # 9-10, p. 12].  Parmer testified that he transported Joshua James to the courthouse.  *Id.*  The defense then asked the trial

13

court for permission to display James in front of the jury.  *Id.*  Neither the State nor the defense examined James because he invoked his Fifth Amendment right to remain silent.  [doc. # 9-8, p. 45-46].  James was, in other words, not amenable to cross-examination.  He made no statements, testimonial or otherwise.  Accordingly, displaying James in front of the jury did not implicate the Confrontation Clause.  This claim should be **DENIED**.

As to the second claim, Petitioner fails to highlight, and this Court cannot locate, any particular instance where a testifying witness recounted Joshua James's out-of-court statements.[5] Consequently, this claim should also be **DENIED**.

### E. Claim Five: Prosecutorial Misconduct

Petitioner claims that the prosecutor improperly vouched for the credibility of some of the State's witnesses during closing argument.  [doc. # 1-1, p. 33].  He admits that he is "unable to point to specific pages" in the record detailing the improper comments, but only because he does not have a copy of the state court record.  *Id.*

Prosecutorial misconduct does not warrant *habeas corpus* relief unless it "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A petitioner must demonstrate that "the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper" misconduct.  *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988).

---

[5] According to the State, Petitioner does not reference the alleged testimony "because it simply did not happen."  [doc. # 9, p. 25].

14

Here, Petitioner fails to point to any specific instance of prosecutorial misconduct even after receiving a copy of the state court record.  [doc. # 9, p. 28].  What is more, the Court conducted an independent review of the prosecutor's argument and found no instances of constitutionally improper conduct.  This claim should be **DENIED**.

F. Claim Six: Trial Court Error

Petitioner claims that the trial court violated his right to due process by failing to instruct the jury members that "they were not allowed to discuss the case with others, read any media accounts of the trial, or report any information that someone or something had influence on their verdict."  [doc. # 1-1, p. 37].  Petitioner also claims, relatedly, that "he was deprived of due process because the jury was swayed by media accounts of the trial and influences outside [of] the courtroom."  *Id.* at 38.

Petitioner's first allegation is patently untrue.  The following exchange took place after the jurors were sworn in:

> Court: Now, I've got a series of questions to ask you that you'll find me asking periodically over the course of the proceedings.  Has anyone discussed this case with anyone else?
>
> Court Reporter: Collective Negative Response.
>
> Court: Have you discussed this case amongst yourselves?
>
> Court Reporter: Collective Negative Response.
>
> * * *
>
> Court: Has anyone exposed themselves to any news accounts of this trial whether by newspaper, radio, television, internet, or any other means?
>
> Court Reporter: Collective Negative Response.
>
> Court: Has anyone attempted to broadcast any information about this trial?

15

Court Reporter: Collective Negative Response.

Court: Very well.  I'll remind you again of my admonitions. Not only can you not do any of these things, you can't—even when you're at break you cannot get back there and say, "Oh, did you see what that witness did" or talk about a legal issue. You can't talk about anything that happened in this courtroom outside of the courtroom until it is time to deliberate.  So even though you may be tempted to discuss amongst each other something you might not think is an important issue, it could become a very important issue.  So I'll admonish you that admonition is you cannot talk about anything that happens in here, whether you think it's a minor or a major thing unless and until it is time to deliberate.

[doc. # 9-5, p. 52-53].[6]  The judge further admonished the jury, immediately preceding a recess,

as follows:

Court: Before I dismiss you, I want to reurge my admonitions to you.  You cannot, you must not discuss this case with anyone.  You cannot discuss this case amongst yourselves about the facts, legal principles, anything, at any point in time until and unless you are—retire for deliberations, which has certainly not happened yet.

* * *

When you go home, your spouse, your friends, they may question you.  Tell them you respect what the Court has ordered.  Do not allow that to happen.  Don't expose yourself to any news accounts of this trial by any means whatsoever.  Do not attempt to broadcast anything about this trial by any means whatsoever . . . .

[doc. # 9-8, p. 10].

Thereafter, again preceding a recess, the judge stated, "[R]emember my admonitions

about not discussing anything and not exposing yourself to anything."  *Id.* at 76.  Following that,

the judge issued a final admonition:

[D]o not discuss this case amongst yourselves or with anyone else.  Not only the facts, but also any type of legal principles that might be at issue.  Do not do any independent research about this case.  Don't try to visit the scene of the alleged crime.  Don't broadcast anything about this case.  Do not expose yourself to any

---

[6] The trial judge similarly admonished the jury at the close of *voir dire*.  [doc. # 13-7, p. 54].

16

news accounts of this case. You've already followed those instructions. I trust you'll continue to do that.

[doc. # 9-9, p. 47].  As is evident, the record clearly disproves Petitioner's first claim.  It should therefore be **DENIED**.

Petitioner's second claim—that he was denied a fair trial due to adverse pretrial publicity—is likewise meritless.  "Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue . . . unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983).  Here, Petitioner's claim is conclusory, speculative, and devoid of factual support.[7]  This claim should also be **DENIED**.

G. Claim Seven: Ineffective Assistance of Counsel

Petitioner argues that his trial counsel rendered ineffective assistance by failing to object to the assignments of error listed above in Sections C-F.  [doc. # 1-1, p. 22-42].  He also claims that counsel performed deficiently in failing to object to the prosecutor's use of "six peremptory challenges to exclude blacks from the jury . . . ." *Id.* at 35.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  If the

---

[7] Petitioner asks for an evidentiary hearing to develop his theory that "the jury verdict was obtained by the outside influence of the news media, newspaper, and racial overtones by the people of the city of Monroe . . . ." [doc. # 1-1, p. 39].  Courts "need not blindly accept speculative and inconcrete claims as the basis upon which to order a hearing . . . ." *West v. Johnson*, 92 F.3d 1385, 1399-00 (5th Cir. 1996) (internal quotation marks and citation omitted). Here, Petitioner merely speculates and provides no basis on which the Court could conclude that a hearing would enable him to prove factual allegations entitling him to relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  Thus, his request for a hearing should be **DENIED**.

petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered. *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997). The prongs of the test also need not be analyzed in any particular order. *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997). Further, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

When applying the first prong of *Strickland*, federal courts do not second-guess the attorney's decision from the distorting perspective of hindsight; rather, they presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. *See Strickland*, 466 U.S. at 689-90. The burden, therefore, is on the petitioner to show that counsel's representation was objectively unreasonable. *Id.* at 688.

To establish prejudice, the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen*, 131 S. Ct. at 1403 (internal quotation marks and citation omitted). Stated differently, a petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair." *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984). Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

18

Finally, when review is governed by the AEDPA, review of the state court's resolution of the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009), since the question is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786. To obtain relief, a petitioner must show that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. "The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788.

Here, as noted, Petitioner first claims that counsel failed to object to the assignments of error set forth above in Sections C-F.  [doc. # 1-1, p. 22-42].  Counsel is not required to make futile motions or objections.  *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (citation omitted).  Here, counsel did not render ineffective assistance in choosing not to object because, for the reasons explained above, any objection to the alleged errors would have been futile.

Petitioner also claims that counsel was ineffective for failing to mount a *Batson* challenge.[8]  [doc. # 1-1, p. 35].  The Equal Protection Clause forbids a prosecutor from striking

---

[8] As a prefatory matter, this claim could properly be deemed too conclusory to warrant relief because Petitioner fails to make particularized allegations and fails to identify any supporting record evidence.  *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (stating

potential jurors solely on account of their race.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  In

*Batson*, the Supreme Court created a three-step analysis for trial courts to use in evaluating a

defendant's claim of a racially discriminatory peremptory challenge.  *Id.* at 96-98.  First, "a

defendant must make a *prima facie* showing that the prosecutor exercised his peremptory

challenges on the basis of race."  *Id.* at 96.  "Once the defendant makes a *prima facie* showing,

the burden shifts to the State to come forward with a [race] neutral explanation . . . ."  *Id.* at 97.

Finally, the "trial court then will have the duty to determine if the defendant has established

purposeful discrimination."  *Id.* at 98.

Here, the *voir dire* transcript indicates that counsel's decision not to object was strategic.

To begin with, Petitioner does not establish, and the record does not reveal, any evidence—such

as a pattern of strikes against minority jurors or discriminatory questions and statements made by

the prosecutor—that raises an inference that the prosecutor struck the venire persons on account

of their race.  *See Batson*, 476 U.S. at 97 (listing illustrative circumstances that could establish a

*prima facie* case).  The only fact that Petitioner definitively establishes is that the prosecution did

strike African American venire persons.  This is insufficient.  *See U.S. v. Branch*, 989 F.2d 752,

755 (5th Cir. 1993) ("Where the only evidence proffered by the defendant is that a black

prospective juror was struck, a prima facie *Batson* claim does not arise."); *Medellin v. Dretke*,

371 F.3d 270, 278-79 (5th Cir. 2004) (rejecting the argument that using six of thirteen peremptory

strikes to excuse minorities presented "statistical evidence of discrimination" because the

"number of strikes used to excuse minority . . . pool members is irrelevant on its own").

---

that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional
issue in a federal habeas proceeding").  Nevertheless, out of an abundance of caution, the Court
will undertake a thorough review.

Further, as Respondent explains, it is clear that any objection would have been meritless because the prosecution could have proffered the following race-neutral reasons for each disputed challenge:

*Lucille Lumpkin, No. 96, b/f* - testified that she knew the victim, Otis King and that his ex-wife is now her sister-in-law. [doc. # 13, p. 26, 36]. Ms. Lumpkin also stated that she knew the Petitioner from childhood. They grew up in the same neighborhood and played together as kids. [doc. # 13-2, p. 141-142]. When asked by the State if having known the Petitioner since childhood would affect her decision, she responded, that all she could do would be to listen and "be openhearted." [*Id.* at 147].

*Roniquia Dunn*, *No. 46*, *b/f,* testified that she had seen the Petitioner in the neighborhood and that she knew him as "Pee Wee." [doc. #s 13, p. 27; 13-2, p. 25]. Ms. Dunn also stated that she is the primary caretaker of a disabled child. [*Id.* at 26-27].

*Glenda Hunter*, *No. 78*, **b/f**- The State filed into the record the criminal history of Ms. Hunter which indicated that she had misdemeanor convictions from the State of Georgia.  [doc. # 13-5, p. 8]. Outside the presence of other prospective jurors, the trial court questioned Ms. Hunter. [*Id.*] Ms. Hunter testified that she worked in a massage parlor in Georgia. [*Id.* at 9].  Her charges in Georgia included, masturbation for hire, sexual assault and prostitution. [*Id.* at 13].

\* \* \*

*Tiffany Jackson, No. 82, b/f* - The undersigned counsel noticed during jury selection that Ms. Jackson appeared disinterested in the case and never smiled. During questioning, she stated that she would like to see the weapon in this case, when the weapon was not found. [doc. # 13-1, p. 12]. Ms. Jackson stated that she was nervous about serving on a murder trial. [doc. # 13-2, p. 4]. She added that she never thought she would "be in the predicament like this." [*Id.*].

*Kieachia Holcomb*, *No. 71, b/f*, - Ms. Holcomb violated the Court's instructions and admitted to talking about the case to other jurors. [doc. # 13-7, p. 20-25].

\* \* \*

*Eddie Jackson, No. 81, b/m* - Mr. Jackson stated that he is a pastor at St. Peter Church in Columbia, Louisiana.  [doc. # 13-6, p. 37]. Mr. Jackson violated the Court's instructions and talked about the case with Ms. Holcomb. [doc. # 13-7, p. 14-19].

[doc. # 9, p. 21-23 (internal citations modified)].  There is no discriminatory intent inherent in any of these ostensible reasons.  *See Hernandez v. N.Y.*, 500 U.S. 352, 360 (1991) (holding that the reasons offered to explain a peremptory challenge should be deemed race-neutral unless a discriminatory intent is inherent in those reasons).  Moreover, had the prosecution offered these reasons, nothing suggests that the trial judge would have found that they were actually pretext for racial discrimination.

Thus, Petitioner fails show that counsel had any basis for making a *Batson* challenge.  By extension, he fails to overcome the presumption that counsel made a sound strategic decision not to challenge the prosecution's peremptory strikes.  *See, e.g., Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (holding that counsel made a strategic decision because he "undoubtedly decided that he was unlikely to mount a successful constitutional challenge to the prosecutor's peremptory strikes."); *see also Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (holding that an "attorney's actions during voir dire are considered to be a matter of trial strategy.").  Accordingly, this claim should be **DENIED**.

**Conclusion**

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Lavern L. Hampton, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or

response to the District Judge at the time of filing.  A courtesy copy of any objection or response

or request for extension of time shall be furnished to the District Judge at the time of filing.

Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 12th day of January, 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE